UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-160 (NEB)

UNITED STATES OF AMERICA,

Plaintiff,

v.

ISAAC HODGE (11)

Defendant.

**GOVERNMENT'S SENTENCING POSITION**

*"Whether it be from violence with guns, drug sales, a combination of both, we have been preyed upon enough as a community."*

- Concerned Community Member Who Fears Retaliation.

For over 20 years, the Highs street gang attempted to hijack much of north Minneapolis. It converted public spaces into open-air drug markets, preyed on vulnerable youths, and normalized the regular sound of machinegun fire. Highs members glorified the gang at the expense of any other consideration. It was more important to shoot a rival gang member on sight—be it a public place, a drive-by shooting, or at a well-attended party—than to worry about killing innocent bystanders. The Highs criminal enterprise is a scourge on public safety.

Defendant Isaac Hodge was a known and active participant in the Highs criminal enterprise.[1] He not only participated he enterprise's fentanyl trafficking, but he also took part in a drug and gang-related shooting that exemplified the violence that was synonymous with the Highs. Hodge's conduct contributed to the fear, instability, and

---

[1] For each defendant in this matter, the government will simultaneously file a sealed letter to the Court outlining additional information regarding each defendant's broader role in the Highs criminal enterprise.

harm that the Highs inflicted on the community. His sentence should reflect the seriousness of the offense, promote public safety, effectuate necessary deterrence, while also considering his decision to accept responsibility for actions. For the reasons discussed below, the government requests that the Court impose a sentence consistent with its recommendation as sufficient but not greater than necessary to satisfy the goals of sentencing under 18 U.S.C. § 3553(a).

## The Highs Criminal Enterprise

The Highs began laying claim to areas of north Minneapolis in 2004. Since that time, the Highs have dominated a large swath of north Minneapolis and its members have ruthlessly protected its turf. The Highs are engaged in a violent rivalry with the Lows. Each gang's moniker stems from its location—north or south—of West Broadway Avenue in Minneapolis:



*Figure 1: Overview of Highs and Lows Territories*

The May 2004 murder of Christopher Little, a known Lows member, proved to be a cataclysmic event in the history of the enterprise. Members of the Highs and Lows have engaged in hundreds of shootings and murders in their territories since Little's murder, which only serves to restart the circles of violence and revenge. The victims of the violence were not only members or associates of the gangs, but also innocent adults and children who simply live within the gangs' territories.

Although the Highs enterprise consists of several "cliques," the gang's singular objective has remained the same: its members must "put in work" to promote, benefit, and enrich the gang. Highs members must commit acts of violence, procure firearms to facilitate the gang's activities, or engage in criminal activity such as fraud, robbery, or drug trafficking. The only other requirement is that members instill fear in rival gang members. Members of the Highs are expected to "hunt" rival gang members: an express directive to locate and kill rivals. Highs members also are expected to defend each other and to respond to any perceived disrespect from rival gangs. Highs and Lows gang members frequently take to social media to heighten their rivalry. Members of each gang post photographs trespassing in the other gang's territory or defacing the graves of murdered rivals. Highs members also frequently post images of themselves with money, drugs, and expensive items to gain respect. This glorification of gang life also serves to lure others into the lifestyle.

The Highs' existence depends on the success of the criminality of its members, which is comprised of a loosely defined and fluid hierarchy of (1) members who earned substantial respect from past criminality and receive a higher amount of the profits, host gatherings, and cover funeral expenses; (2) members focused on engaging in armed

3

violent activity to protect Highs activities and target rival members; and (3) members focused on drug or weapons trafficking to further the ends of the criminal enterprise. Its members resort to any crime—murder, kidnapping, arson, robbery, bribery, extortion, gambling, fraud, drug trafficking, arms dealing—so long as it glorifies the Highs enterprise or denigrates a rival gang.

Although its general credo has created violence in many parts of Minneapolis, a particular area within Highs territory acts as a representative microcosm of its activities. The Highs criminal enterprise runs rampant in the area of West Broadway and North Lyndale Avenue, including numerous businesses, and turned it into a de facto Highs headquarters:



*Figure 2: Intersection of West Broadway and North Lyndale Avenue in Minneapolis*

In fact, the Winner Gas Station has been openly referred to as "The Murder Station," "Murder Shop," or simply the "Murder," while the nearby Merwin Liquors and

Walgreens have been essentially open-air drug markets.[2] The Highs stranglehold on this area has been so tight that its members do not hesitate to flaunt their illegal activities openly:



*Figure 3: Highs Member Flaunting Currency Outside Winner Gas in Highs Territory*

The sheer amount of gun violence, drug trafficking, and other illicit activity demonstrate the extent to which the Highs have damaged the community. Between 2018 and 2023, in north Minneapolis alone—comprising both Highs and Lows territory—the statistics are staggering:

- 2,043 recovered firearms;
- 105 recovered switches;
- 7,997 "shots fired" calls;
- 20,265 ShotSpotter activations;

---

[2]    This Walgreens location has since closed, in part due to the Highs activities in and around its location.  This is a representative example of how the enterprise can affect the economic health of communities.

- 1,151 gunshot victims; and
- 155 homicides

The plague of opioids—and particularly fentanyl, a prime Highs product—requires no introduction. According to the Minnesota Department of Health, in 2022, Minnesota reported 4,228 non-fatal opioid-involved overdoses.[3] Unfortunately, overdose deaths in Minnesota due to opioid misuse has skyrocketed from 342 in 2018 to 1,002 in 2022.[4] Hennepin County alone experienced 378 opioid-related deaths in 2022, 94.7% of which were directly linked to fentanyl.[5] Beginning in approximately 2020, the Highs began actively contributing to this epidemic when it transitioned from marijuana sales as its primary moneymaker to instead peddling synthetic opioids.

Put simply, instead of getting gas at the local station or picking up prescriptions at the neighborhood Walgreens, residents near Highs territory live with the fear of being robbed, shot with a machinegun during a gang-related shooting, or losing a loved one to a fentanyl-related incident. The Highs criminal enterprise, fueled by the greed of its members and their thirst for power and respect, is a public health crisis.

### Isaac Hodge's Offense Conduct

Defendant Isaac Hodge was a member of "now defunct" Family Mob gang, which associated with the Highs criminal enterprise. ECF No. 770 (PSR) at ¶¶ 15-23. Hodge played a dual role within the Highs conspiracy by serving as a supplier of fentanyl to

---

[3] Minnesota Department of Health, *Drug Overdose Dashboard,* last accessed 2/6/2024 at https://www.health.state.mn.us/opioiddashboard.

[4] *Id.*

[5] Hennepin County, *Overdose Epidemic*, last accessed 2/6/2024 at https://www.hennepin.us/opioid.

Highs members and directly participating in acts of violence that furthered the gang's objectives. *See, generally, id*. As part of his involvement, Hodge supplied fentanyl to Highs distributors, supplied illegal firearm conversion devices ("switches") to Highs members, regularly carried firearms, and participated in violence directed at rival gang members. *Id*. This combination of drug supply and violence placed Hodge in a position of trust within the organization and reflects meaningful participation in advancing the enterprise's criminal objectives.

Hodge's most serious conduct occurred on November 7, 2021, when he and codefendants traveled to confront a rival gang member. PSR at ¶¶ 16-19. Armed with firearms, they encountered their intended target and opened fire. Hodge admitted that he intended to kill the rival gang member when he fired multiple rounds. *Id*. at ¶ 19. Instead, the gunfire struck two innocent bystanders. *Id*. at ¶¶ 16, 19. One victim was shot while driving past the scene, sustaining a gunshot wound to the upper back that required hospital treatment. *Id*. at ¶ 17. The second victim was shot the back and leg, causing a lung injury and temporary inability to move his legs and also requiring emergency hospitalization. *Id*. at ¶ 18. This shooting illustrates the extreme danger created by gang violence in public spaces. The intended target was not struck, but two uninvolved civilians suffered serious injuries as a direct result of Hodge's decision to engage in retaliatory gang violence.

Hodge also participated in the Highs' fentanyl distribution activities. In February 2023, he supplied 845 fentanyl pills for distribution through a Highs member to a cooperating purchaser. *Id*. at ¶ 21. Hodge is directly responsible for approximately 92 grams of fentanyl and agreed he is accountable for at least 400 grams distributed by

7

the conspiracy. *Id*. at ¶ 22-23. The Highs routinely conducted drug sales while armed, using firearms to protect their trafficking operations. *Id*. at ¶ 14. Hodge participated in this armed trafficking environment and understood violence was part of maintaining the gang's drug market.

Hodge ultimately accepted responsibility for his conduct and acknowledged the harm caused by his actions. In a written statement he admitted his participation in the shooting and drug trafficking and expressed remorse, stating he takes full responsibility and intends to move forward in a more positive direction. *Id*. at ¶ 31.

## The Presentence Investigation Report

The Presentence Investigation Report calculated a total offense level at 36 after acceptance of responsibility. *Id*. at ¶ 65. Hodge's criminal history score of 19 places him in Criminal History Category VI, the highest criminal history category under the Guidelines. *Id*. at ¶ 91. These calculations result in an advisory guideline imprisonment range of 324 to 405 months' imprisonment. *Id*. at ¶ 146. The government agrees with the PSR's Guidelines calculations.

## The Appropriate Sentence

Hodge's offense conduct must be understood within the broader context of the Highs criminal enterprise, which caused significant and sustained harm to the north Minneapolis community. His conduct contributed to the very heart of the broader pattern of harm caused by the Highs criminal enterprise. His participation in the Highs' fentanyl trafficking operation helped sustain a narcotics market that fueled addiction and violence within the community. His involvement in the 2021 gang-related shooting further illustrates the dangers associated with gang conflicts and narcotics trafficking.

8

The Court should therefore consider the collective harm inflicted by the Highs enterprise when determining an appropriate sentence. A meaningful custodial sentence as recommended by the government reflects the seriousness of his criminal conduct, the need to protect the public, and holds Hodge accountable for his individual conduct while also recognizing his early and sincere acceptance of responsibility.

## A. The Applicable Law

In following the sentencing methodology laid out by the Supreme Court, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.* at 49-50. Section 3553(a) requires the Court to consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a). But a district court is not required to provide a mechanical recitation of the Section 3553(a) factors and "has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. San-Miguel*, 634 F.3d 471, 475-76 (8th Cir. 2011).

## B. The 3553(a) Factors

### 1. Nature and Circumstances of the Offense

The nature and circumstances of Hodge's offenses reflect serious criminal conduct involving both fentanyl trafficking and gang-related firearm violence. The record also reflects contextual considerations the Court may properly weigh in assessing Hodge's relative culpability. Hodge did not merely associate with a criminal enterprise, he advanced it through both violence and narcotics distribution. His participation included attempted murder of a rival gang member, shooting two innocent bystanders, supplying fentanyl into an open-air drug market, and supporting gang access to dangerous weapons. The shooting conduct is particularly aggravating because it demonstrates a willingness to commit lethal violence in public. The fact that two innocent individuals were struck underscores the indiscriminate danger posed by gang retaliation shootings. A substantial term of imprisonment is therefore necessary to reflect the seriousness of the offense while still accounting for his relative role.

### 2. The Need for the Sentence to Reflect Seriousness, Promote Respect for the Law, and Protect the Public

A substantial custodial sentence is necessary to reflect the seriousness of Hodge's conduct, because attempted murder and fentanyl trafficking are among the most dangerous federal crimes. It is also necessary to promote respect for the law and protect the public. At the same time, the sentence should remain proportionate to his acceptance of responsibility and actions following arrest. A sentence that is substantial will appropriately balance the seriousness of firing into a public area, the harm caused

to innocent victims, as well as Hodge's acceptance of responsibility and personal characteristics.

Furthermore, Hodge's offense conduct demonstrates a willingness to engage in armed violence in public settings and to participate in fentanyl distribution. These facts show a clear risk to community safety if he were not incapacitated for a meaningful period. At the same time, his age and demonstrated acceptance of responsibility suggest his risk of recidivism may decrease following a significant custodial sentence. A substantial term of imprisonment therefore balances the need to protect the public from further violent conduct and recognition that lengthy incarceration itself reduces future risk. The sentence recommended by the government also promotes respect for the law by demonstrating that serious gang violence results in significant consequences while still recognizing individualized sentencing principles.

### 3. The Need for Deterrence

Deterrence is particularly important in gang-related RICO cases because such organizations rely on the perception that violence advances status and territory. A meaningful sentence serves both, sending a clear message that gang shootings and fentanyl distribution will result in lengthy federal sentences. Hodge's prior federal convictions demonstrate that lesser sanctions have not deterred his criminal conduct. A significant custodial sentence is therefore necessary to discourage future criminal activity.

### 4. History and Characteristics of the Defendant

Hodge's personal history presents both aggravating and mitigating considerations. On the one hand, his criminal history reflects longstanding involvement

with drugs and firearms, including prior federal convictions for drug trafficking and firearm possession. His continued involvement in gang-related conduct into adulthood demonstrates a pattern of poor decision-making and association with criminal influences.

On the other hand, the PSR reflects mitigating characteristics relevant to sentencing. He was raised in a stable household by a supportive mother, he maintains relationships with several of his children, he has demonstrated the ability to maintain legitimate employment, and he accepted responsibility for his conduct. His employment history demonstrates his capacity to function lawfully when he chooses to do so. Taken together, his background suggests a defendant with a serious criminal history but also some indicators of rehabilitative potential.

## Conclusion

The government respectfully submits that its recommended sentence reflects the seriousness of Hodge's participation in a violent drug-trafficking conspiracy, promotes respect for the law, and provides meaningful deterrence, while also recognizing his acceptance of responsibility. For these reasons, the recommended sentence is sufficient, but not greater than necessary, to achieve the purposes of sentencing set out in 18 U.S.C. § 3553(a).

Dated: March 20, 2026                          Respectfully Submitted,


                                               DANIEL N. ROSEN
                                               United States Attorney

                                               /s/ Albania Concepcion
                                               Albania Concepcion (ID: 0401536)
                                               Assistant United States Attorney

12